IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KIN CHUN CHUNG,

    Plaintiff,

      v.

JPMORGAN CHASE BANK, N.A.,

    Defendant.

CIVIL ACTION FILE
NO. 1:11-CV-2131-TWT

## OPINION AND ORDER

This is a wrongful foreclosure action. It is before the Court on the Defendant's Motion for Summary Judgment [Doc. 87]. For the reasons set forth below, the Defendant's Motion for Summary Judgment [Doc. 87] is GRANTED in part and DENIED in part.

## I. Background

This is an unusual foreclosure case. On March 27, 2007, the Plaintiff Kin Chun Chung purchased property ("Chung Property") located at 2755 Sudbury Trace in Norcross, Georgia. (Def.'s Statement of Undisputed Material Facts ¶ 1.) On the same day, the Plaintiff's then-husband Kam Biu Chan purchased property ("Chan Property") located at 2775 Sudbury Trace in Norcross, Georgia. (Id. ¶ 37.) In connection with their purchases, both the Plaintiff and Chan executed a note and a security deed in

favor of Global Lending, LLC. (Id. ¶¶ 2, 38.) Following these transactions, both loans were assigned to the Defendant JP Morgan Chase Bank, N.A. ("Chase"). (Id. ¶¶ 3, 39.) The monthly payments for both loans were identical. (Id. ¶ 40.)

On January 21, 2009, the Plaintiff called Chase to change the address for where she wished to receive her mortgage statements. (Id. ¶ 41.) Chase alleges that the Plaintiff instructed it to send the mortgage statements to the Chung Property. (Id. ¶ 41.) The Plaintiff alleges that she instructed Chase to send the mortgage statements to the Chan Property. (Pl.'s Statement of Material Facts ¶ 7.) The mortgage statements, along with the payment coupons, were  sent to the Chung Property. However, the Plaintiff was not residing in the Property at the time. (Def.'s Statement of Undisputed Material Facts ¶ 42.) The events giving rise to this action then followed. Generally, Chan would make the payments for both properties. (Id. ¶ 50.) As a result of not having the payment coupon for the Property, Chan would send in two checks along

with the payment coupon for the Chan Property. (Id. ¶ 55.) One of the checks was intended to cover the Plaintiff's monthly obligation. The Plaintiff alleges that Chase informed her that she could "note the loan number on the check and send it in without the corresponding payment coupon." (Pl.'s Statement of Material Facts ¶ 10.) Furthermore, Chan alleges that he spoke to Chase multiple times and that he was told the same thing. (Id. ¶¶ 11-13.) The additional checks sent by Chan included the account number of the Plaintiff's loan in the memorandum section. (Id. ¶ 76; Chung Aff., Ex. F.) Beginning in June of 2009, Chan and the Plaintiff made payments for the Property in this manner. (Def.'s Statement of Undisputed Material Facts ¶¶ 54, 60, 81, 84.)

Upon receipt, Chase would credit all of the checks to Chan's account because only his coupon was included. (Id. ¶¶ 57, 62, 82, 86, 103, 118.) Chase admits that it never referenced the memorandum section on the checks. (Id. ¶ 62.) Thus, Chan was repeatedly being informed that his account was credited with multiple advanced payments. (Id. ¶¶ 58, 63, 83, 87, 98, 104, 119.) On September 1, 2009, the Plaintiff was informed that her account was "in default because [she] failed to pay the required monthly installments commencing with the payment due 07/01/2009." (Id. ¶ 66.) Chase began contacting the Plaintiff on a near daily basis to resolve the situation. (Id. ¶ 75.) The Plaintiff, Chan, and their son say that they informed Chase that the

additional payments made by Chan were intended to cover the Plaintiff's obligations. (Pl.'s Statement of Material Facts ¶¶ 21, 27, 33-34, 36.)

On September 10, 2009, the Plaintiff called Chase and requested an investigation. (Def.'s Statement of Undisputed Material Facts ¶ 69.) Chase informed the Plaintiff that she must send her bank statements and copies of the cancelled checks in order to validate her claim. (Id. ¶ 71.) The Plaintiff alleges that a request was sent, via facsimile and U.S. mail, along with the required documents. (Pl.'s Statement of Material Facts ¶¶ 25-26.) Chase contends that it never received it. (Def.'s Statement of Undisputed Material Facts ¶ 73.) Thus, no investigation took place. (Id. ¶ 74.) Chase never credited the Plaintiff's account with the payments. Consequently, Chase maintained that the account was in default. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J., at 5.)

On December 30, 2009, Chase initiated the foreclosure process. (Def.'s Statement of Undisputed Material Facts ¶ 88.) Chase retained McCalla Raymer, LLC to handle the foreclosure. (Id. ¶ 89.) In January of 2010, the Plaintiff submitted a payment to Chase for the amount of her monthly charge without a payment coupon attached. (Id. ¶ 91.) The check included the account number for the Plaintiff's loan in the memorandum section. (Id.) Chase returned the check to the Plaintiff and indicated that the check could not be accepted because the account was in foreclosure, and that

the funds were insufficient to cure the default. (Id. ¶ 92.) In March of 2010, the Plaintiff once again sent in a payment for the amount of her monthly charge without a payment coupon. (Id. ¶ 105.) Chase again returned the check. (Id. ¶ 106.) Chase, through McCalla Raymer, then published a Notice of Sale for the Property. (Pl.'s Statement of Material Facts ¶ 62.) On April 6, 2010, the home was sold at an auction where Chase was the highest bidder. (Id. ¶ 59.) Chase then subsequently transferred the Property to the Federal National Mortgage Association, and the Property was then sold. (Id. ¶¶ 61, 63.)

The Plaintiff asserts claims for wrongful foreclosure, breach of contract and the implied covenant of good faith and fair dealing, negligence and gross negligence, conversion, violation of RESPA, defamation, and intentional infliction of emotional distress. The Plaintiff alleges that the foreclosure caused her to suffer injuries aside from loss of the Property. The Plaintiff alleges that multiple fees were levied against the Plaintiff, including late fees, property preservation fees, fax fees, and corporate advance fees. (Id. ¶¶ 66-73.) The Plaintiff alleges that the stress alone brought about a serious stomach condition. (Id. ¶ 80.) The Plaintiff further alleges that her credit rating suffered as a result of Chase informing credit bureaus of the foreclosure. (Id. ¶ 85.) The Plaintiff alleges that she lost certain possessions due to the foreclosure,

such as a washer, dryer, dishwasher, and certain "irreplaceable items." (Id. ¶ 88.)
Chase moves for summary judgment on all claims.

## II. Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient  showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir.1990).

### III. Discussion

#### A. Wrongful Foreclosure

The Plaintiff claims that the Defendant could not foreclose upon her property because she was not in default. (Second Am. Compl. ¶¶ 88-90.) Consequently, the Plaintiff argues, the Property was wrongfully foreclosed upon. Under Georgia law, to recover for wrongful foreclosure a plaintiff must "[1] establish a legal duty owed to it by the foreclosing party, [2] a breach of that duty, [3] a causal connection between the breach of that duty and the injury it sustained, and [4] damages." Racette v. Bank of America, N.A., 318 Ga. App. 171, 174 (2012). "[A] violation of the [foreclosure] statute is necessary to constitute a wrongful foreclosure." McCarter v. Bankers Trust Co., 247 Ga. App. 129, 132 (2000). "A claim for wrongful exercise of a power of sale under OCGA § 23-2-114 can arise when the creditor has no legal right to foreclose." DeGolyer v. Green Tree Servicing, LLC, 291 Ga. App. 444, 449 (2008); see also Brown v. Freedman, 222 Ga. App. 213, 214 (1996); Adams v. Mortgage Electronic Registration Systems Inc., No. 1:11-CV-04263-RWS, 2012 WL 1319453, *7 (N.D. Ga. Apr. 16, 2012) ("Plaintiff alleges that Defendants foreclosed on the Property notwithstanding the fact that Plaintiff was not in arrears . . . [t]his allegation is sufficient to plausibly show that Defendants breached their duty to exercise fairly the power of sale.").

The Defendant's right to foreclose arises from the terms of the Security Deed. See Gordon v. South Cent. Farm Credit, ACA, 213 Ga. App. 816, 817 (1994) ("Under Georgia law, [i]t is clear that a security deed which includes a power of sale is a contract and its provisions are controlling as to the rights of the parties thereto and their privies."); You v. JP Morgan Chase Bank, N.A., 293 Ga. 67, 70 (2013). The provision establishing the power of sale states:

> 22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument . . . [i]f the default is not cured on or before the date specified in the notice, Lender at its option may . . . invoke the power of sale.

(Security Deed § 22.)   The provision detailing the Plaintiff's payment obligation states:

> 1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note . . . *[p]ayments are deemed received by Lender when received at the location designated* in the Note or at such other location as may be designated by Lender.

(Security Deed § 1) (emphasis added).  Thus, to avoid triggering the power of sale, the Plaintiff was to send timely payment to Chase. Both parties reference the distinction between (1) the Plaintiff making payments for her account and (2) Chase crediting those payments to the Plaintiff's account. The right to foreclose does not turn on this distinction. The Security Deed requires the Plaintiff to make timely payments to

Chase. If this occurs, the Plaintiff is not in default. Although a subsequent failure to credit the Plaintiff's account may cause the records to incorrectly reflect that the Plaintiff is in default, it does not mean that she is actually in default. More importantly, it does not mean that Chase's remedial rights have been activated.

Here, there is no dispute that the extra checks sent with the Chan coupon were sufficient to cover the Plaintiff's obligations. Additionally, there is evidence that the extra checks were intended to satisfy the Plaintiff's obligations. The memorandum section on the extra checks noted the Plaintiff's account number. (Chung Aff., Ex. F.) The Plaintiff does not deny that Chase informed Chan that it thought all of the checks were for the Chan Property. However, the Plaintiff testified that when Chase contacted her, she informed Chase that the additional checks were meant to satisfy her payment obligations. (Chung Aff. ¶¶ 14, 18-19.) Chan also testified that he repeatedly informed Chase of this.[1] (Chan Aff. ¶¶ 18, 22.) If these facts are true, then the Plaintiff did not default on her mortgage and Chase had no right to foreclose on the Property.

---

[1] Chase disputes this. Chase cites two sources of evidence: a declaration by Assistant Secretary for Chase Karie H. Mullen and notes produced by Chase agents during their phone calls with the Plaintiff ("call notes"). First, the Mullen Declaration does state that the Plaintiff "cursed" and hung up on Chase agents "more than thirty times," but it does not affirmatively state that the Plaintiff never instructed Chase that the extra checks were for her obligations. (Mullen Decl. ¶ 32.) Second, the call notes are not transcripts of the phone calls. (Mullen Decl., Ex. B.) They are brief notes in shorthand form. (Mullen Decl., Ex. B.)

Chase's response is that the Plaintiff's payments were sent along with the Chan Property coupon instead of with her coupon. Chase fails to state, with precision, a single legal theory for how this means that the Plaintiff breached her obligations under the Security Deed. Other than reciting the bare elements of a wrongful foreclosure action, Chase cites no legal authority supporting its argument. As noted, the right to foreclose is determined by the text of the Security Deed. Nowhere in the Security Deed is the Plaintiff required to make payments pursuant to Chase's coupon policy. In fact, Chase was not even a party to the original Security Deed. Even though Chase's mortgage statements indicated that the coupon was required, Chase may not impose, by fiat, new obstacles to payment not found in the contract. If the coupon policy had been incorporated into the Security Deed, the analysis would be different. For example, in Carmichael v. Saxon Mortgage Services, Inc., No. 2:11-cv-1110, 2013 WL 4786120 (M.D. Ala. Sept. 6, 2013), the payment agreement expressly stated that "[a]ll payments . . . shall be made by cashier's check and/or bank wire." Carmichael tendered a personal check, with his account number on the memorandum line. Id. at *2. This check was then diverted into an account that Saxon did not use for storing mortgage payments. Id. Thus, Saxon was unaware that it was a mortgage payment from Carmichael. Id. Saxon initiated the foreclosure process and Carmichael sued. Id. at *3. The court reasoned that "[t]he Agreement required that payment must . . . be

made by certified check or wire transfer . . . Carmichael's check . . . was a personal check rather than a certified check . . . [t]his, in and of itself, constitutes a breach . . . of the [Agreement], thereby giving Saxon the authority to continue with the foreclosure action." Id. at *4. Here, payment without a coupon would not constitute a default under the Security Deed.  Summary judgment as to the Plaintiff's claim for wrongful foreclosure should be denied.[2]

   B. Breach of Contract

   The Plaintiff claims that Chase breached Section 2 of the Security Deed by failing to apply the payments to her account. (Second Am. Compl. ¶ 55.) The Plaintiff also claims that Chase's negligent servicing of her loan constituted a breach of the implied covenant of good faith and fair dealing. (Second Am. Compl. ¶ 58.) "The elements of a right to recover for a breach of contract are the breach and the resultant damages to the party who has the right to complain about the contract being broken."

---

   [2] Chase points out that in multiple telephone conversations the Plaintiff allegedly lost her temper and told Chase to "go ahead and foreclose." (Def.'s Mot. Summ. J., at 1, 7.) There is no legal significance to this. Chase offers no reason why her statement should be interpreted literally. In fact, following the conversations, but before foreclosure, the Plaintiff continued to try and make payments. (Def.'s Mot. Summ. J., at 8.) Chase also argues that the Plaintiff rented out the Property in violation of the Security Deed. (Def.'s Mot. Summ. J., at 2-3.) This cannot serve as an alternative justification for the foreclosure. The Security Deed requires that notice of the grounds for foreclosure be given so that the borrower may have an opportunity to cure. (Security Deed § 22.) Here, the Notice of Intent to Foreclose only specified the Plaintiff's alleged failure to pay as the grounds. (Chung Aff., Ex. B.)

Budget Rent-a-Car of Atlanta, Inc. v. Webb, 220 Ga. App. 278, 279 (1996) (internal quotation mark omitted). "Every contract implies a covenant of good faith and fair dealing in the contract's performance and enforcement." Myung Sung Presbyterian Church, Inc. v. North American Ass'n of Slavic Churches & Ministries, Inc., 291 Ga. App. 808, 810 (2008). "The implied covenant modifies and becomes a part of the provisions of the contract, but the covenant cannot be breached apart from the contract provisions it modifies and therefore cannot provide an independent basis for liability." Id. This Court has previously recognized a breach of contract action for failure to apply payments. See Bates v. JPMorgan Chase Bank, N.A., No. 4:12-CV-43, 2012 WL 3727534, *5 (N.D. Ga. Aug. 27, 2012) (the plaintiff sufficiently alleged that Chase breached the contract by failing to apply payments); see also Stroman v. Bank of America Corp., 852 F. Supp. 2d 1366, 1377 (N.D. Ga. 2012) (plaintiff sufficiently plead breach of contract when "[d]efendants . . . failed to apply her payments properly according to the terms of the contract.").

Chase argues that Section 2 does not require Chase to apply payments. (Def.'s Mot. Summ. J., at 19-20.) Rather, Section 2 only indicates the order in which a payment is allocated among principal, interest, and tax once Chase decides to apply the payment. (Def.'s Mot. Summ. J., at 19-20.) Thus, Chase argues, because it chose not to apply the payments to the Plaintiff's account due to her failure to send the

requisite coupons, Section 2 was not triggered.  (Def.'s Mot. Summ. J., at 19-20.) To support its argument, Chase references the first sentence of Section 2: "[A]ll payments accepted and applied by Lender shall be applied in the following order of priority . . .." (Security Deed § 2.)

There are two reasons why Section 2 cannot be interpreted as giving Chase discretion in deciding whether to apply payments. First, under Georgia law, contracts should be interpreted so as to not render any part superfluous. See Harris County v. Penton, 211 Ga. App. 498, 499 (1993) ("In construing contracts, Georgia law requires us to give meaning to every term rather than construe any term as meaningless."). The Security Deed expressly details the conditions under which Chase may choose not to apply payments after accepting them. For example, Section 1 states: "Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights . . . but Lender is not obligated to apply such payments at the time such payments are accepted." (Security Deed § 1.) If the Security Deed were interpreted to permit Chase to not apply payments on grounds not found in the Security Deed, there would be no reason to spell out certain grounds in the Security Deed. A second reason to reject Chase's interpretation of Section 2 is that "[a] contract must be given a reasonable construction which will uphold and enforce the instrument, if possible, rather than a construction which would . . . lead to an absurd

result." <u>Tudor v. American Emp. Ins. Co.</u>, 121 Ga. App. 240, 242 (1970). Chase's reading of Section 2 would lead to the odd result where Chase has absolute discretion, upon receiving payment, to decide whether and where to record it. Thus, if the Plaintiff is correct that Chase was informed that the extra checks were intended for her account, Chase breached Section 2 by failing to apply them accordingly.

The Court reiterates that the right to foreclose does not turn on whether Chase applies the payments to the Plaintiff's account. They are triggered if the Plaintiff fails to make timely payments. Thus, a breach of Section 2 would not have resulted in Chase having the right to foreclose. If the Plaintiff fulfilled her payment obligation, the right never arose at all. However, Chase did not argue damages in its Motion for Summary Judgment. Chase only argued that it did not breach Section 2. Thus, summary judgment as to the Plaintiff's breach of contract claim should be denied. Breach of the implied covenant of good faith and fair dealing cannot be an independent claim. Therefore, it merges into the breach of contract claim.

C. <u>Negligence and Gross Negligence</u>

The Plaintiff claims that Chase was negligent and grossly negligent in servicing her loan. (Second Am. Compl. ¶¶ 44-45, 49-51.) "A plaintiff in a breach of contract case has a tort claim only where, in addition to breaching the contract, the defendant also breaches an independent duty imposed by law." <u>USF Corp. v. Securitas Sec.</u>

Services USA, Inc., 305 Ga. App. 404, 408-09 (2010) (internal quotation mark omitted). "To maintain an action in tort because of a breach of duty growing out of a contractual relation, the breach must be shown to have been a breach of duty imposed by statute or a duty imposed by a recognized common law principle." Deacon v. Deacon, 122 Ga. App. 513 (1970); see also Bouboulis v. Scottsdale Ins. Co., 860 F. Supp. 2d 1364, 1380 (N.D. Ga. 2012) (Under Georgia law, "a defendant's mere negligent performance of a contractual duty does not create a tort cause of action; rather, a defendant's breach of contract may give rise to a tort cause of action only if the defendant also breached an independent duty created by statute or common law."). "The general rule in Georgia is that a breach of contract cannot constitute a tort unless a special or confidential relationship exists between the parties." Willis v. Allstate Ins. Co., 321 Ga. App. 496, 501 (2013). "[I]t is well settled that [t]he party asserting the existence of a confidential relationship has the burden of establishing its existence." Id. (internal quotation marks omitted).

Chase argues that the Plaintiff has not established a duty that Chase breached. Although the Plaintiff listed nine duties in her Second Amended Complaint, she supplied no legal authority imposing these duties on Chase. The Plaintiff nevertheless makes several arguments. Citing Mauldin v. Sheffer, 113 Ga. App. 874 (1966), the Plaintiff argues that "[i]t is possible for a contract to impose a legal duty, which exists

apart from the specific obligation of the contract." (Pl.'s Br. Opp'n Def.'s Mot. Summ. J., at 22.) This does not mean that a contract can create a duty the breach of which gives rise to a tort action. A contract can, however, establish a relationship such that an independent duty is imposed by law. See Mauldin, 113 Ga. App. at 878 ("[P]rivate duties may . . . flow from relations created by contract.").

The Plaintiff then argues that, in Johnson v. Citimortgage, Inc., 351 F. Supp. 2d 1368 (N.D. Ga. 2004), this Court found a duty to exist. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J., at 24.) The Court did not conclude that there was an independent duty to non-negligently service a loan. The Court was reviewing the negligence claim on a motion to dismiss. See Johnson, 351 F. Supp. 2d at 1370. It denied the motion on the grounds that the "[p]laintiff may later prove facts showing that Defendant's duties arose independent of any contract between Plaintiff and Defendant." Id. at 1379. Here, the Court is reviewing the matter on a motion for summary judgment. The Plaintiff must establish that the facts give rise to an independent duty. The Plaintiff has failed to do so. In fact, this Court recently rejected a similar negligence claim due to the plaintiff's failure to establish this independent duty. See Kynes v. PNC Mortg., No. 1:12-CV-4477-TWT, 2013 WL 4718294, at *11-12 (N.D. Ga. Aug. 30, 2013) (The negligence claim was dismissed because the plaintiff did not establish an independent duty to not negligently service a loan.).

The Plaintiff finally argues that, under Georgia law, "[o]ne who undertakes to do an act or perform a service for another has a duty to exercise care." (Pl.'s Br. Opp'n Def.'s Mot. Summ. J., at 23-24.) The Plaintiff cites <u>Stelts v. Epperson</u>, 201 Ga. App. 405 (1991). The duty described in <u>Stelts</u> is not as broad as the Plaintiff suggests. First, reading the duty that broadly would nearly eviscerate the general rule that an action in tort will not lie for the negligent performance of a contractual duty. Second, subsequent cases interpreting <u>Stelts</u> have read it narrowly. They make clear that there is a justifiable reliance element. For example, in <u>S & A Industries, Inc. v. Bank of Atlanta</u>, 247 Ga. App. 377 (2000), the court interpreted the <u>Stelts</u> holding to be: "Where one undertakes an act which he has no duty to perform *and another reasonably relies upon that undertaking*, the act must generally be performed with ordinary and reasonable care." (emphasis in original); <u>see also</u> <u>Presto v. Sandoz Pharmaceuticals Corp.</u>, 226 Ga. App. 547 (1997) (The court described the <u>Stelts</u> holding to include a reasonable reliance element). In <u>Savu v. Suntrust Bank</u>, 293 Ga. App. 683 (2008), the Georgia Court of Appeals addressed <u>Stelts</u> in the context of a bank-customer relationship. The court concluded that there was no reasonable reliance, thus there was no fiduciary duty that could be breached. <u>Id.</u> at 691. Here, the Plaintiff is not alleging justifiable reliance. Additionally, Georgia case law establishes

that a lender owes no fiduciary duty to a borrower. See Moore v. Bank of Fitzgerald, 225 Ga. App. 122, 127 (1997).

"The only duties that Plaintiff alleges [Chase] violated were its duties to service her loan in a non-negligent manner and to exercise ordinary care in the servicing of her loan . . . [t]hese duties, however, do not sustain separate tort duties outside of [Chase's] administration of the Mortgage." McGinnis v. American Home Mortg. Servicing, Inc., No. 5:11-CV-284, 2012 WL 426022, *6 (M.D. Ga. Feb. 9, 2012). Consequently, summary judgment against the Plaintiff's claims of negligence and gross negligence should be granted.

D. Conversion

The Plaintiff claims three instances of conversion: (1) Chase's failure to apply the payments to her account; (2) the loss of household appliances and "irreplaceable items" pursuant to the foreclosure sale; and (3) the assessment of improper fees to the Plaintiff's account. (Second Am. Compl. ¶¶ 69-71.) "Conversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation." Decatur Auto Center v. Wachovia Bank, N.A., 276 Ga. 817, 819 (2003). "Any distinct act of dominion wrongfully asserted over another's property in

denial of his right, or inconsistent with it, is a conversion." Id. "In order to establish a claim for conversion, the complaining party must show (1) title to the property or the right of possession, (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other party to return the property." Capital Financial Services Group, Inc. v. Hummel, 313 Ga. App. 278, 280-81 (2011). "Where a defendant originally obtained lawful possession of property, the plaintiff must show actual conversion or demand for the property's return coupled with the defendant's refusal to return the property." Stroman, 852 F. Supp. 2d at 1379.

Chase's failure to apply the payments to the Plaintiff's account did not constitute conversion. Chase lawfully came into possession of the payments. The Plaintiff is not alleging that she asked Chase to return the money. She is alleging that she asked Chase to acknowledge that it satisfied her payment obligations. The Plaintiff's claim for conversion based on items lost in the foreclosure also fails. In regards to the "irreplaceable items," the Plaintiff fails to specify the items, or provide any evidence such that a jury could estimate their worth. This precludes recovery under a theory of conversion. See Brown Bark II, L.P. v. Dixie Mills, LLC, 732 F. Supp. 2d 1353, 1361 (2010) ("To recover damages for conversion or replevin under Georgia law, a plaintiff must . . . furnish[ ] the jury with sufficient data to estimate the damages with reasonable certainty."). Regarding the other items, the Plaintiff concedes that they are

fixtures. See <u>Tifton Corp. v. Decatur Federal Sav. and Loan Ass'n</u>, 136 Ga. App. 710, 711 (1975) ("[A]nything intended to remain permanently in place such as fencing, fixtures, stoves and refrigerators, is a part of the realty and passes with it."). Conversion does not apply to real property. See <u>Levenson v. Word</u>, 294 Ga. App. 104, 105 n.2 (2008) ("An action for conversion and trover will not lie to recover real property."). Further precluding recovery, the Plaintiff does not even allege that Chase still possesses any of these items. See <u>Viasys Services, Inc. v. McCurdy & Stone</u>, No. Civ.A. 1:05-CV-1259-JOF, 2006 WL 949932, at *6 (N.D. Ga. Apr. 11, 2006) ("[I]t is undisputed that the . . . Defendants retained only a certain limited portion . . . of the [money] and are not in actual possession of the remaining amounts . . . Plaintiff's conversion claim . . . can only stand with respect to that portion of the [money] . . . retained.").

   E. <u>RESPA</u>

   The Plaintiff claims that she sent Chase a qualified written request ("QWR") pursuant to the Real Estate Settlement Procedures Act ("RESPA"). (Second Am. Compl. ¶ 60.) The Plaintiff claims that Chase then failed to comply with its RESPA obligations. (Second Am. Compl. ¶¶ 61-65.) "Pursuant to § 2605(e), a loan servicer, upon receipt of a qualified written request, must provide a written response acknowledging receipt of the correspondence within 20 business days." <u>Chipka v.</u>

Bank of America, 355 Fed. Appx. 380, 382 (11th Cir. 2009) (internal quotation marks

omitted). "RESPA further requires that, within 60 business days of receipt of a

qualified written request, the servicer must either: (1) make appropriate corrections

in the account . . . ; (2) after conducting an investigation, provide the borrower with

a written explanation that includes a statement of the reasons for which the servicer

believes the account is correct . . . ; or (3) after conducting an investigation, provide

the borrower with a written explanation that includes the information requested by the

borrower or an explanation of why the information requested is unavailable. . . ." Id.

Chase alleges that it never received the QWR and thus its RESPA obligations

were never triggered. Karie H. Mullen, an Assistant Secretary for Chase with access

to and personal knowledge of Chase's business records, testified that "[i]f the

requested documents were received by Chase, they would be saved as part of the Loan

file" and that "[t]here is no evidence in the Loan file that Chase received any written

correspondence from Plaintiff." (Mullen Decl. ¶ 25.) Richarda Winder, a Home Loan

Research Officer for Chase, also testified at her deposition that Chase had no record

of receiving the Plaintiff's request. (Winder Dep. at 93.) Winder testified that under

Chase's system, images of these requests would be posted to "i-vault," and that a

search of "i-vault" for a written request by the Plaintiff yielded no results. (Winder

Dep. 135-136.) However, Winder also indicated that she "would not say every single thing that's sent in would be imaged in i-vault." (Winder Dep. 96.)

The Plaintiff and Chan testified in their affidavits that a request containing the information required by RESPA was sent to Chase via U.S. Mail and facsimile. (Chung Aff. ¶ 16; Chan Aff. ¶ 16.) The Plaintiff testified that Chan faxed the request to the number provided by Chase, and that she "personally saw confirmation that the fax was successful." (Chung Aff. ¶ 16.) The Plaintiff testified that her son, A. Chan, sent the request through U.S. Mail. (Chung Aff. ¶ 16.) The Plaintiff has not produced the fax confirmation or a copy of the letter.

The Court must determine whether there is a genuine issue of material fact regarding whether Chase received a QWR. "The common law has long recognized a rebuttable presumption that an item properly mailed was received by the addressee." In re Farris, 365 Fed. Appx. 198, 199 (11th Cir. 2010). "The 'presumption of receipt' arises upon proof that the item was properly addressed, had sufficient postage, and was deposited in the mail." Id. "The mere denial of receipt, without more, is insufficient to rebut the presumption." Id. at 200. "Many courts characterize 'mere denial' as just that: denial without additional facts that point to the credibility of the addressee's denial." In re Prescott, 285 B.R. 763, 767 (Bankr. S.D. Ga. 2001). However, direct testimony of nonreceipt, particularly in combination with evidence

that standardized procedures are used in processing claims, is sufficient to support a

finding that the mailing was not received, and thereby rebut the presumption accorded

a proper mailing. In re Hobbs, 141 B.R. 466, 468 (Bankr. N.D. Ga. 1992).[3] Here, no

rational trier of fact could conclude, based on the evidence, that Chase received a

QWR. Chase has supplied evidence regarding its procedure for handling these

requests. A paper copy of the request is placed in the borrower's Loan file and an

electronic image of the request is generally placed in an online system. A diligent

search of both produced no results. The Plaintiff has not produced a copy of the letter.

Chase's uncontested evidence is sufficient to overcome the presumption. Summary

judgment as to the Plaintiff's RESPA claim should be granted.

       F. Defamation

       The Plaintiff claims that two of Chase's publications were libel per se. First,

Chase reported to credit bureaus that the Plaintiff was delinquent. (Second Am.

Compl. ¶ 83.) Second, Chase published a Notice of Sale indicating that the Plaintiff's

property was subject to foreclosure. (Second Am. Compl. ¶ 84.) The Plaintiff argues

that because she is in the business of purchasing and renting properties, the

publications tended to injure her in her trade. Under Georgia law, "[a] libel is a false

---

[3] The "presumption of receipt" has been applied in the context of RESPA claims. See In re Walter, 489 B.R. 298, 306 (Bankr. S.D. Ga. 2012).

and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." O.C.G.A. § 51-5-1(a). "To state a claim for libel under Georgia law, the [plaintiff] must plead a false statement that either: (1) is libel per se; or (2) caused them to suffer special damages." McGowan v. Homeward Residential, Inc., 500 Fed. Appx. 882, 885 (11th Cir. 2012) (citing Webster v. Wilkins, 217 Ga. App. 194, 196 (1995)). "Libel per se is a false statement 'that one is guilty of a crime, dishonesty or immorality . . . [or] that tend[s] to injure one in his trade or business." Id. (citing Zarach v. Atlanta Claims Ass'n, 231 Ga. App. 685, 688 (1998)). For a statement to fall under the "trade or business" category of libel per se, it must be "especially injurious to the plaintiff's reputation because of the particular demands or qualifications of plaintiff's vocation." Bellemead, LLC v. Stoker, 280 Ga. 635, 637 (2006). "[T]he words must either be spoken of the plaintiff in connection with his calling or they must be of such a nature such as to charge him with some defect of character or lack of knowledge, skill, or capacity as necessarily to affect his competency successfully to carry on his business, trade, or profession." Id.  Finally, "if the statement is not ambiguous and can reasonably have but one interpretation, the question is one of law for the judge." Mead v. True Citizen, Inc., 203 Ga. App. 361, 362 (1992).

Here, the publications were not libel per se. They did not attack the Plaintiff's general capacity to effectively carry out her profession. They just indicated that she defaulted on a mortgage. Although statements disparaging a business' reputation within its trade may sometimes constitute libel per se, language imputing to a business or professional man ignorance or mistake on a single occasion and not accusing him of general ignorance or lack of skill is not actionable per se. A charge that plaintiff in a single instance was guilty of a mistake, impropriety or other unprofessional conduct does not imply that he is generally unfit. Barna Log Homes of Georgia, Inc. v. Wischmann, 310 Ga. App. 844, 847 (2011). Furthermore, even though Chase's publications may permit a negative inference, "the court may not hunt for a strained construction in order to hold the words used as being defamatory as a matter of law, and the negative inference a hearer might take from the words does not subject the speaker to liability for [defamation] per se." Bellemead, 280 Ga. at 637-38 (internal quotation marks omitted).[4]

---

[4] In Bellemead, the court did suggest that indicating that "a merchant whose credit is necessary to the operation of his business that he . . . does not pay his bills on time would be libelous." Bellemead, 280 Ga. at 637. However, the Court reads that to mean that general statements regarding one's propensity to not pay bills on time could be libel per se. It would not be libel per se to merely identify specific payments missed.

The Plaintiff cites <u>Stalvey v. Atlanta Business Chronicle, Inc.</u>, 202 Ga. App. 597 (1992) in support. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J., at 14-15.) In that case, two female tenants at a particular apartment complex were sexually assaulted, allegedly by a former maintenance worker who had the master keys. See <u>Stalvey</u>, 202 Ga. App. at 598. The defendant published an article stating that Stalvey was the property supervisor, that he instructed the police that it was unnecessary to question the maintenance worker after the first assault, and that Stalvey told the assistant manager to "not to make it a common topic of company conversation." <u>Id.</u> The title of the article was "[Jane Doe]'s story reveals the human side of apartment security." <u>Id.</u> The court concluded that "when these statements are read *in the context of the entire article in question*, they may be taken as an attack on plaintiff's reputation as a property (apartment) manager." <u>Id.</u> at 600 (emphasis added). Unlike in <u>Stalvey</u>, the alleged libel here did not reference the trade or profession of the Plaintiff. Additionally, in <u>Stalvey</u> the article as a whole was an affront to Stalvey's ability to ensure the safety of an apartment complex. Here, the publications did not indict the Plaintiff's capabilities in the same manner. Summary judgment against the Plaintiff's claim for defamation should be granted.

G. Intentional Infliction of Emotional Distress

Under Georgia law, a claim of intentional infliction of emotional distress contains the following elements: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; and (4) The emotional distress must be severe." United Parcel Service v. Moore, 238 Ga. App. 376, 377 (1999). In order to be sufficiently extreme and outrageous, the conduct must "go beyond all reasonable bounds of decency so as to be regarded as atrocious and utterly intolerable in a civilized community." Id. Actionable conduct generally does not include "mere insults, indignities, threats, annoyances, petty oppressions, or other vicissitudes of daily living." Id. Whether reasonable persons could find that the conduct reaches this level is a question of law for the court. See id.; Racette v. Bank of America, N.A., 318 Ga. App. 171, 179 (2012) ("Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law.").

Here, Chase's conduct does not rise to the level of extreme and outrageous. Even assuming, *arguendo*, that Chase mishandled the servicing of the Plaintiff's loan, "[s]harp or sloppy business practices, even if in breach of contract, are not generally considered as going beyond all reasonable bounds of decency as to be utterly

intolerable in a civilized community." <u>United Parcel Service</u>, 238 Ga. App. at 377. To the extent that the Plaintiff is basing her claim on the act of foreclosure itself, "[the Plaintiff's] claim for intentional infliction of emotional distress seems largely subsumed by [her] claim for wrongful foreclosure." <u>Peterson v. Merscorp Holdings, Inc.</u>, No. 1:12-cv-00014-JEC, 2012 WL 3961211, at *6 (N.D. Ga. Sept. 10, 2012). The Court need not look to the Defendant's argument regarding causation and the Plaintiff's alleged medical problem. Summary judgment against the Plaintiff's claim for intentional infliction of emotional distress should be granted.

H. <u>Punitive Damages and Attorney's Fees</u>

"Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). Whether the "evidence of conscious indifference to the consequences, i.e., the intentional, knowing or wilful disregard of the rights of another, [is] sufficient to warrant imposition of punitive damages [is] a question for the jury." <u>First Union Nat. Bank of Georgia v. Cook</u>, 223 Ga. App. 374 (1996), <u>overruled in part</u> by <u>Golden Peanut Co. v. Bass</u>, 249 Ga. App. 224 (2001). The Court of Appeals of Georgia previously found, in a similar circumstance, that there was a genuine issue of material

fact for a jury to resolve. Id. ("Although punitive damages cannot be imposed without a finding of some form of culpable conduct . . . Cook presented evidence showing that First Union pursued the foreclosure even though Cook had made it known that his security deed had been marked paid . . .."). Summary judgment against the Plaintiff's claim for punitive damages should be denied.

Under Georgia law, attorney's fees are recoverable when the "defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." O.C.G.A. § 13-6-11. "Bad faith is bad faith connected with the transaction and dealings out of which the cause of action arose, rather than bad faith in defending or resisting the claim after the cause of action has already arisen." Lewis v. D. Hays Trucking, Inc., 701 F. Supp. 2d 1300, 1313 (N.D. Ga. 2010) (internal quotation marks omitted). "Bad faith requires more than 'bad judgment' or 'negligence,' rather the statute imports a 'dishonest purpose' or some 'moral obliquity' and implies 'conscious doing of wrong' and a 'breach of known duty through some motive of interest of ill will.'" Id. "Questions concerning bad faith under this statute are generally for the jury to decide, and the trial court may grant judgment as a matter of law on such issues only in the rare case where there is absolutely no evidence to support the award of expenses of litigation." Hewitt Associates, LLC v. Rollins, Inc., 308 Ga. App. 848, 853 (2011) (internal quotation marks omitted). "Even

slight evidence of bad faith can be enough to create an issue for the jury." <u>Lloyd's Syndicate No. 5820 v. AGCO Corp.</u>, 319 Ga. App. 260, 268 (2012) (internal quotation marks omitted). Here, the Court cannot conclude that there is "absolutely no evidence" to support the claim that Chase acted with the bad faith necessary for the Plaintiff to recover attorney's fees. Summary judgment as to the Plaintiff's claim for attorney's fees should be denied.

IV. <u>Conclusion</u>

For the reasons set forth above, the Court GRANTS in part and DENIES in part the Defendant's Motion for Summary Judgment [Doc. 87].

SO ORDERED, this 24 day of September, 2013.

/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge